AO 91 (Rev. 11/11)  Criminal Complaint (Rev. by USAO on 3/12/20)    ☐ Original    ☐ Duplicate Original

# UNITED STATES DISTRICT COURT
for the
Central District of California



FILED
CLERK, U.S. DISTRICT COURT
9/19/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___bm___ DEPUTY

LODGED
CLERK, U.S. DISTRICT COURT
9/19/2023
CENTRAL DISTRICT OF CALIFORNIA
BY: ___CD___ DEPUTY

United States of America

v.

AUBREY CLEMONS,

Defendant(s)

Case No. 2:23-mj-04822-DUTY

## CRIMINAL COMPLAINT BY TELEPHONE
## OR OTHER RELIABLE ELECTRONIC MEANS

I, the complainant in this case, state that the following is true to the best of my knowledge and belief.

On or about the date(s) of September 18, 2023, in the county of Los Angeles in the Central District of California, the defendant(s) violated:

| Code Section | Offense Description |
|---|---|
| 18 U.S.C. § 841(a)(1), (b)(1)(A) | Possession with Intent to Distribute a Controlled Substance |

This criminal complaint is based on these facts:

*Please see attached affidavit.*

☒ Continued on the attached sheet.

/s/ Carlos Gonzalez, TFO
*Complainant's signature*

Carlos Gonzalez, Task Force Officer
*Printed name and title*

Attested to by the applicant in accordance with the requirements of Fed. R. Crim. P. 4.1 by telephone.

Date: 9/19/2023

*Judge's signature*

City and state: Los Angeles, California

Hon. Jean Rosenbluth, U.S. Magistrate Judge
*Printed name and title*

AUSA: Alix McKenna (x6166)

**AFFIDAVIT**

I, Carlos Gonzalez, being duly sworn, declare and state as follows:

### I.  PURPOSE OF AFFIDAVIT

1. This affidavit is made in support of a criminal complaint against Aubrey CLEMONS for a violation of 21 U.S.C. §§ 841(a)(1), (b)(1)(A)(vi): Possession with Intent to Distribute Fentanyl.

2. This affidavit is also made in support of a search warrant for the following digital devices (collectively, the "SUBJECT DEVICES") seized from CLEMONS when he was arrested on September 18, 2023, in the custody of the DEA in Los Angeles, California, as described more fully in Attachment A:

    a. A dark purple iPhone with no case ("SUBJECT DEVICE 1");

    b. A light purple iPhone with a clear case ("SUBJECT DEVICE 2"); and

    c. A dark gray Lenovo Chromebook with serial number "YX01YNEC" ("SUBJECT DEVICE 3").

3. The requested search warrant seeks authorization to seize evidence, fruits, or instrumentalities of violations of 21 U.S.C. § 841(a)(1) (possession with intent to distribute controlled substances) and 21 U.S.C. § 846 (conspiracy and attempt to distribute controlled substances) (the "Subject Offenses"), as described more fully in Attachment B.

4. The facts set forth in this affidavit are based upon my personal observations, my training and experience, and

information obtained from various law enforcement personnel and witnesses.  This affidavit is intended to show merely that there is sufficient probable cause for the requested complaint and warrants and does not purport to set forth all of my knowledge of or investigation into this matter.  Unless specifically indicated otherwise, all conversations and statements described in this affidavit are related in substance and in part only, all amounts or sums are approximate, and all dates and times are on or about those indicated.

## II. BACKGROUND OF AFFIANT

5.   I am a sworn Task Force Officer ("TFO") with the Drug Enforcement Administration ("DEA"), and have been so employed since May 2023.  I have been employed as a Police Officer for approximately 17 years.  I am currently employed as a Police Detective for the City of Los Angeles Airport Police Department (the "Airport Police"), and assigned to the DEA Los Angeles Field Division-Los Angeles International Airport Narcotics Task Force ("LAXNTF") since February 2023.

6.   The LAXNTF is an inter-agency task force based at the Los Angeles International Airport ("LAX"), that consists of various federal, state, and local law enforcement agencies. The LAXNTF is focused on investigating airport/airline internal conspiracies in which criminal enterprises recruit airport/airline employees to exploit their privileged airport access and knowledge of existing airport security procedures, as well as airline passengers smuggling drugs and drug proceeds through the airport.   Previous and

current investigations have identified Transnational Criminal Organizations ("TCOs") that rely generally on drug trafficking as their primary source of revenue.  As such, TCOs require the use of various forms of transport to traffic in large amounts of illicit drugs, and air travel provides a significant opportunity for them to do so.  Additionally, air travel provides an opportunity to smuggle and distribute other contraband, including drug proceeds.

7. During my career, I have received numerous trainings related to drug trafficking, and I have personally been involved in hundreds of drug-related investigations, including numerous investigations involving drugs being trafficked through the aviation system.  In these investigations, I have participated in the execution of search warrants, conducted physical surveillances, reviewed video surveillance, interviewed suspects, and discussed drug investigations with other experienced drug investigators concerning the methods and practices utilized by drug traffickers.  I am familiar with the ways in which Drug Trafficking Organizations ("DTO") smuggle and traffic narcotics and controlled substances, through airports and the aviation system.  Drug smugglers use digital devices to facilitate and conceal their criminal activities.

8. Based on my training and experience, I am familiar with the methods of operation of narcotics traffickers, including the importation, exportation, distribution, transportation, and storage of controlled substances, as well

at the collection of money proceeds of drug trafficking and methods of money laundering used to conceal the nature of the proceeds. I am also familiar with the methods of operation used by people who distribute controlled substances, including the distribution, storage, and transportation of controlled substances.

### III. SUMMARY OF PROBABLE CAUSE

9.  On September 18, 2023, at approximately 7:00 a.m., Aubrey CLEMONS traveled to LAX and attempted to pass through security with approximately 1.1 kilograms of suspected fentanyl pills concealed inside a neck pillow in his carry-on bag.

10. Surveillance footage shows CLEMONS, dressed in a yellow hoodie and yellow shorts, arrive at a security checkpoint with a backpack and a duffel bag. CLEMONS then took a plastic bag out of the backpack and placed it in a security bin. During the screening of the black plastic bag, a TSA officer saw an anomaly on the x-ray machine, prompting a TSA supervisor to ask who owned the bag. After CLEMONS confirmed the bag was his, the supervisor asked CLEMONS for identification. CLEMONS then fled the gate area and left the airport on a bus traveling to the Budget Car Rental. Airport police officers responded to the Budget Car Rental, where they spotted CLEMONS getting into a Lyft rideshare vehicle. As officers opened the door to the rideshare vehicle, they heard CLEMONS tell someone on the phone "they got me."

## IV. STATEMENT OF PROBABLE CAUSE

### A. TSA Discovers Drugs in CLEMONS' black colored neck pillow.

11.  Based on my review of law enforcement reports, conversations with other law enforcement officers, my own review of surveillance footage from LAX, and my own participation in the investigation, I know the following:

  a.  CLEMONS entered LAX Terminal 5 on September 18, 2023 with a ticket to travel from LAX to Louisville Kentucky. As discussed below, surveillance footage shows CLEMONS enter the security checkpoint at approximately 7:07 a.m. and place baggage --- including a black plastic bag --- on the conveyer belt for TSA screening.

  b.  At the time, TSA Officer Yancy Escobar was assigned as the x-ray operator at LAX Terminal 5.  When screening the black plastic bag, TSA Officer Escobar saw an anomaly, namely, "dots on a neck pillow" on the x-ray monitor. TSA Officer Escobar then requested a secondary bag search.

  c.  TSA Officer Guadalupe Barbosa was working the secondary bag check area.  The secondary bag check area is adjacent to the X-ray screening belt area and visible to the public.  TSA Officer Barbosa received the plastic bag for a secondary bag search.  TSA Officer Barbosa conducted a secondary search of the plastic bag and saw a black neck pillow with multiple pills inside.  TSA Officer Barbosa notified TSA Supervisor Nelson-Owens of the pillow with pills inside.  As discussed below, the pills were blue in color and stamped with

an "M" on one side, and "30" on the other side, which are markings consistent with authentic Oxycodone 30 mg pills. However, based on my training and experience, I know that counterfeit "M30" pills are the most common pressed fentanyl pill distributed in the United States.

       d.  According to reports, TSA Supervisor Nelson-Owens asked who owned the black plastic bag and CLEMONS said the bag belonged to him.  Nelson-Owens then asked CLEMONS for his identification and boarding pass.  In response, CLEMONS then fled from the TSA screening checkpoint and attempted to flee the airport.

    12.  TSA Supervisor Nelson-Owens was able to take a photograph of CLEMONS before he fled the area.  I reviewed the photograph and compared it to CLEMONS Kentucky driver's license photograph, obtained later in the investigation, and it appeared to be the same person.  Nelson-Owens contacted LAXPD and requested law enforcement assistance.

    **B. Surveillance Footage Shows CLEMONS Placing the Bag Containing Suspected Fentanyl on the Conveyor Leading to the X-Ray Machine**

    13.  I obtained and reviewed surveillance footage of the x-ray screening area at Terminal 5.  The surveillance footage shows that, at approximately 7:03:50 a.m., CLEMONS entered the screening area wearing a yellow hoodie and yellow shorts, and carrying a backpack and a duffel bag.  At approximately 7:05:26 a.m., he removed a black plastic bag from his backpack.  He then placed the plastic bag in one bin, his backpack in a second bin, and the duffel bag in a third bin.  CLEMONS then put all three

6

of the bins on the conveyor belt that fed into the x-ray machine. CLEMONS then passed through the separate scanning machine designed for people and waited for his luggage to be screened. He then pulled his backpack and duffel bag off the conveyor belt. The x-ray operator then appeared to signal to someone.

    14. I obtained and viewed surveillance footage from the secondary screening area. At approximately 7:17:09 a.m., CLEMONS is seen leaving the secondary screen area carrying his backpack and duffel bag and walking towards the gate area. I also obtained surveillance footage from the gate area. CLEMONS is visible walking through the gate area at approximately 7:18 a.m. I also obtained and reviewed security footage from a tunnel leading from the gate area to the baggage claim area and from the baggage claim area. At approximately 7:19 a.m., CLEMONS is seen running through the tunnel towards the baggage claim. At approximately 7:20 a.m., CLEMONS is seen on surveillance footage entering the baggage claim area from the tunnel and then exiting the terminal to the outside curb. At approximately 7:21 a.m., he is seen boarding Budget Bus #2.

    **C. Officers Locate CLEMONS at a nearby Car Rental Facility.**

    15. At approximately 7:20 a.m., LAXPD Officers Ryan Johnson and Cisneros arrived at the TSA screening area. Cisneros assisted in the search for CLEMONS, while Officer Johnson stayed with the plastic bag at the screening area.

    16. According to Officer Cisneros, TSA Supervisor Nelson-Owens provided a description of CLEMONS to the LAXPD dispatch,

who then broadcasted that description over the radio.  The description given was a male, Black, wearing a yellow hooded sweater, and yellow shorts.  According to Officer Cisneros, an LAXPD officer assigned to monitor airport surveillance footage put out a radio broadcast saying that a possible suspect was on the lower level of Terminal 5 under a car rental sign, boarding Budget Rental Car Bus Number 2.

17.  I know based on my experience working cases at LAX that Budget Car Rental runs a courtesy shuttle from the central terminal area to their car rental facility location at 775 Airport Blvd., Los Angeles, California, 90045.  I also know based on my experience working airport cases that the company runs several buses, each of which has a designated number.

18.  Officer Cisneros informed me that she spoke to a TSA officer, who told her that the suspect exited the gate area of the airport terminal via an exit tunnel that led to the baggage claim on the lower level of Terminal 5.

19.  I know based on my review of reports and conversations with law enforcement that Los Angeles Airport Police Officers Rafael Outley and Marcos Paredes responded to the Budget Rental Car located at 775 Airport Blvd., Los Angeles, California.  Officer Outley saw Bus Number 2 and made contact with the driver.

20.  Officer Outley asked if a Black male wearing a yellow hoodie got off the bus.  The bus driver said yes, and indicted that the man went around a corner.  Officer Outley and Officer Paredes went in the direction that the driver indicated and saw

a black male wearing black shorts and a black hoodie getting into the rear of a Lyft ride share vehicle.

21. Other than the Lyft driver, they did not see any other persons in the area. The officers yelled at the Lyft driver to stop, and he complied. Officer Paredes opened the rear passenger door. CLEMONS was seated in the back holding a phone, which was either SUBJECT DEVICE 1 or SUBJECT DEVICE 2, and having a phone conversation.

22. CLEMONS spontaneously stated, "they got me." Per Officer Outley, the officers detained CLEMONS pending their investigation. Per Officer Outley, they asked CLEMONS for permission to search his bags, and he consented. Inside, they found a yellow sweater and matching yellow shorts.

23. According to Officer Outley, the officers found a second cell phone while searching CLEMONS duffel bag (SUBJECT DEVICE 1 or SUBJECT DEVICE 2), and a laptop inside of his backpack (SUBJECT DEVICE 3).

**D. TSA Supervisor Nelson-Owens Identifies CLEMONS**

24. Los Angeles Airport Police Officer Figueroa transported TSA Supervisor Nelson-Owens to the Budget Car Rental for a field show-up identification. TSA Supervisor Nelson-Owens positively identified CLEMONS as the individual who fled the TSA screening checkpoint and who claimed ownership of the black plastic bag, with the black neck pillow which contained the suspected fentanyl.

**E. A Preliminary Analysis Shows that CLEMONS Possessed Over a Kilogram of Suspected Fentanyl**

25. The LAX Narcotics Task Force responded to the Terminal 5 screening area to investigate the seizure of suspected narcotics. When TFO Marlon Coronado and I arrived, we examined the black neck pillow and saw the pillow was not smooth, and the outer fabric was very thin. I was able to see the pills' blue color through the fabric and that they were consistent in appearance with M30 pills. The pillow was unzipped and I could see blue pills inside. I took possession of the neck pillow and took it to the LAXNTF office for further investigation.

26. Upon returning to the LAXNTF office, I conducted a presumptive test of one of the blue colored pills, utilizing the "TruNarc" spectrometer device. That test came back inconclusive.

27. Based on my training and experience and conversations with experienced investigators, it is common for pills containing fentanyl to have an inconclusive presumptive screening test due to the binding compounds used to press counterfeit pills. However, I saw that the pills had "M" and "30" markings embossed. Based on my training, experience, and conversations with experienced narcotics investigators, drug dealers often manufacture counterfeit oxycodone pills, which are frequently blue in color and marked with an "M" and a "30." Based on my experience and consultation with seasoned narcotics investigators, counterfeit oxycodone pills contain fentanyl the

10

majority of the time and are the most common pressed fentanyl pill in the United States.

28. TFO Coronado weighed the pills in my presence. The pills weighed approximately 1,160 grams, including the packaging. DEA Group Supervisor Randall Davis also inspected the blue colored pills. Based on his 33 years of DEA narcotic investigative experience, he formed the opinion that the pills were counterfeit oxycodone pills that likely contained fentanyl. The pills have been submitted to a DEA laboratory for analysis.

### F. Investigators Interview CLEMONS

29. Officers Outley and Paredes transported CLEMONS and his belongings, including a dark purple iPhone with no case ("SUBJECT DEVICE 1"), a light purple iPhone with a clear case ("SUBJECT DEVICE 2") and a dark gray colored Lenovo Chromebook with serial number "YX01YNEC" ("SUBJECT DEVICE 3"), to the LAXNTF office.

30. While at the LAXNTF office, TFO Coronado and I conducted an interview with CLEMONS. At 10:07 a.m., I read CLEMONS his Miranda rights and CLEMONS acknowledged he understood his rights. CLEMONS initialed the DEA-13 Advice of Rights form and indicated he was willing to participate in an interview, which was recorded. During the interview, CLEMONS said that he had arrived in Los Angeles on September 17, 2023. However, he then asked if he could have an attorney present, at which time we concluded our interview and advised CLEMONS he was under arrest for the narcotics in his possession. CLEMONS was placed in the holding cell.

31. At approximately 10:30 a.m., CLEMONS knocked on the cell door to garner our attention. CLEMONS verbally expressed to TFO Coronado and myself that he wished to continue the interview without the presence of an attorney.

32. At 10:35 a.m., I read CLEMONS his rights under <u>Miranda</u> and CLEMONS acknowledged he understood his rights. CLEMONS initialed the DEA-13 Advice of Rights form and indicated he was willing to answer questions without his attorney present. This interview was also recorded.

33. CLEMONS stated he arrived on Spirit Airlines on September 17, 2023. He had purchased a one-way ticket through an online third party booking company. He said he flew out to buy marijuana because marijuana was legal in California. He intended to buy an ounce of marijuana and some edibles from "Wonderland Weed House."

34. CLEMONS then stopped providing direct answers to direct questions asked by TFO Coronado and myself and we ended the interview.

### V. TRAINING AND EXPERIENCE ON DRUG OFFENSES

35. Based on my training and experience and familiarity with investigations into drug trafficking conducted by other law enforcement agents, I know the following:

    a. Drug trafficking is a business that involves numerous co-conspirators, from lower-level dealers to higher-level suppliers, as well as associates to process, package, and deliver the drugs and launder the drug proceeds. Drug traffickers often travel by car, bus, train, or airplane, both

domestically and to foreign countries, in connection with their illegal activities in order to meet with co-conspirators, conduct drug transactions, and transport drugs or drug proceeds.

  b. Drug traffickers often maintain books, receipts, notes, ledgers, bank records, and other records relating to the manufacture, transportation, ordering, sale and distribution of illegal drugs.  The aforementioned records are often maintained where the drug trafficker has ready access to them, such as on their cell phones and other digital devices.

  c. Communications between people buying and selling drugs take place by telephone calls and messages, such as e-mail, text messages, and social media messaging applications, sent to and from cell phones and other digital devices.  This includes sending photos or videos of the drugs between the seller and the buyer, the negotiation of price, and discussion of whether or not participants will bring weapons to a deal.  In addition, it is common for people engaged in drug trafficking to have photos and videos on their cell phones of drugs they or others working with them possess, as they frequently send these photos to each other and others to boast about the drugs or facilitate drug sales.

  d. Drug traffickers often keep the names, addresses, and telephone numbers of their drug trafficking associates on their digital devices.  Drug traffickers often keep records of meetings with associates, customers, and suppliers on their digital devices, including in the form of calendar entries and location data.

13

## VI. TRAINING AND EXPERIENCE ON DIGITAL DEVICES

36. As used herein, the term "digital device" includes the SUBJECT DEVICES.

37. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that the following electronic evidence, inter alia, is often retrievable from digital devices:

    a.  Forensic methods may uncover electronic files or remnants of such files months or even years after the files have been downloaded, deleted, or viewed via the Internet. Normally, when a person deletes a file on a computer, the data contained in the file does not disappear; rather, the data remain on the hard drive until overwritten by new data, which may only occur after a long period of time. Similarly, files viewed on the Internet are often automatically downloaded into a temporary directory or cache that are only overwritten as they are replaced with more recently downloaded or viewed content and may also be recoverable months or years later.

    b.  Digital devices often contain electronic evidence related to a crime, the device's user, or the existence of evidence in other locations, such as, how the device has been used, what it has been used for, who has used it, and who has been responsible for creating or maintaining records, documents, programs, applications, and materials on the device. That evidence is often stored in logs and other artifacts that are not kept in places where the user stores files, and in places where the user may be unaware of them. For example, recoverable

14

data can include evidence of deleted or edited files; recently used tasks and processes; online nicknames and passwords in the form of configuration data stored by browser, e-mail, and chat programs; attachment of other devices; times the device was in use; and file creation dates and sequence.

   c. The absence of data on a digital device may be evidence of how the device was used, what it was used for, and who used it.  For example, showing the absence of certain software on a device may be necessary to rebut a claim that the device was being controlled remotely by such software.

   d. Digital device users can also attempt to conceal data by using encryption, steganography, or by using misleading filenames and extensions.  Digital devices may also contain "booby traps" that destroy or alter data if certain procedures are not scrupulously followed.  Law enforcement continuously develops and acquires new methods of decryption, even for devices or data that cannot currently be decrypted.

  38. Based on my training, experience, and information from those involved in the forensic examination of digital devices, I know that it can take a substantial period of time to search a digital device for many reasons, including the following:

   a. Digital data are particularly vulnerable to inadvertent or intentional modification or destruction.  Thus, often a controlled environment with specially trained personnel may be necessary to maintain the integrity of and to conduct a complete and accurate analysis of data on digital devices, which

15

may take substantial time, particularly as to the categories of electronic evidence referenced above.

   b.  Digital devices capable of storing multiple gigabytes are now commonplace.  As an example of the amount of data this equates to, one gigabyte can store close to 19,000 average file size (300kb) Word documents, or 614 photos with an average size of 1.5MB.

   39.  Other than what has been described herein, to my knowledge, the United States has not attempted to obtain this data by other means.

## VII. CONCLUSION

   40.  Based on the foregoing facts and opinions, and on my training and experience, I believe that there is probable cause to believe that CLEMONS violated Title 21, United States Code, Section 841(a)(1), (b)(1)(A)(vi): Possession with Intent to Distribute Fentanyl.  There is also probable cause that the items to be seized described in Attachment B will be found in a search of the SUBJECT DEVICES described in Attachment A.

Attested to by the applicant in
accordance with the requirements
of Fed. R. Crim. P. 4.1 by
telephone on this 19th day of
September, 2023.

_____
THE HONORABLE JEAN ROSENBLUTH
UNITED STATES MAGISTRATE JUDGE