CUAUHTEMOC ORTEGA (Bar No. 257443)
Federal Public Defender
JAKE CRAMMER (Bar No. 329928)
(E-Mail: Jake_Crammer@fd.org)
Deputy Federal Public Defender
321 East 2nd Street
Los Angeles, California 90012-4202
Telephone: (213) 894-7564
Facsimile: (213) 894-0081

Attorneys for Defendant
AUBREY CLEMONS

# UNITED STATES DISTRICT COURT

## CENTRAL DISTRICT OF CALIFORNIA

## WESTERN DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA, | Case No. 2:23-cr-00484-PA |
| Plaintiff, | |
| v. | **DEFENDANT'S SENTENCING POSITION; DECL OF COUNSEL; EXHIBITS** |
| AUBREY CLEMONS, | |
| Defendant. | |

Defendant Aubrey Clemons, through his counsel of record, Deputy Federal Public Defender Jake Crammer, hereby submits his response to the presentence report and position regarding sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED: February 6, 2024      By   */s/ Jake Crammer*

JAKE CRAMMER
Deputy Federal Public Defenders
Attorney for AUBREY CLEMONS.

TABLE OF AUTHORITIES

PAGE(S)

I.    INTRODUCTION ................................................................. 1

II.   ARGUMENT .......................................................................... 1

    A.   Mr. Clemons's Story ...................................................... 2

        1.   After a Childhood Plagued by Sexual Abuse, Drug Use, Lies, and Instability, Aubrey Nearly Loses Hope ............................ 2

        2.   Mr. Clemons Regains Hope After Becoming a Father, but his Future Plans are Cut Short by a Five-Year Sentence for Selling Burned DVDs ........................ 3

        3.   Mr. Clemons Experiences a Personal Renaissance and Becomes a Role Model in his Community ........................ 7

        4.   Mr. Clemons's Substance Abuse and Financial Stability Worsen, Especially During the COVID-19 Pandemic ..................... 8

    B.   Mr. Clemons's Sentence .............................................. 13

        1.   Procedural History .................................................. 14

        2.   The Advisory Guidelines ...................................... 14

            a.   The USPO has Calculated Mr. Clemons's Offense Level Correctly ........................ 14

            b.   Mr. Clemons's Criminal History Category is Overstated ..... 14

               (1)   Five-Year Sentence for Selling Burned DVDs ........... 15

               (2)   Simple Possession of Marijuana Misdemeanors ........ 17

        3.   18 U.S.C. § 3553(a) Factors ........................................ 18

            a.   The Nature and Circumstances of Mr. Clemons's Offense Support a Lenient Sentence ..................... 18

            b.   When Imposing Sentence, the Court Should Account for Mr. Clemons's Personal History and Characteristics ...... 19

    C.   Conclusion ..................................................................... 20

ii

# TABLE OF AUTHORITIES

PAGE(S)

**Federal Cases**

*Gall v. United States,*
    552 U.S. 38 (2007)...................................................................................... 1

*Kimbrough v. United States,*
    552 U.S. 85 (2007)...................................................................................... 1

*Pepper v. United States,*
    562 U.S. 476 (2011)............................................................................. 1, 2, 3

**Federal Statutes**

18 U.S.C. § 2319 ....................................................................................... 15

18 U.S.C. § 2320 ....................................................................................... 15

18 U.S.C. § 3553(a) .................................................................................. 18

18 U.S.C. § 3553(a)(1) ............................................................................. 18

U.S.S.G. § 2B5.3 ...................................................................................... 15

U.S.S.G. § 2B5.3(a) .................................................................................. 15

U.S.S.G. §2B5.3(b)(1) .............................................................................. 15

U.S.S.G. § 2D1.1(a)(5) ............................................................................. 14

U.S.S.G. § 2D1.1(c)(5) ....................................................................... 14, 18

U.S.S.G. § 2D1.1(b)(18) ..................................................................... 14, 18

U.S.S.G. § 2D1.1(c)(11) ........................................................................... 18

U.S.S.G. § 3B1.2(b) ........................................................................... 14, 18

U.S.S.G. § 3E1.1(a) ...................................................................... 14, 15, 19

U.S.S.G. § 3E1.1(b) ........................................................................... 14, 19

U.S.S.G. § 4A1.2(e)(1) ............................................................................. 16

U.S.S.G. § 4A1.2(e)(2) ............................................................................. 16

U.S.S.G. § 4A1.3 ...................................................................................... 17

TABLE OF AUTHORITIES

PAGE(S)

U.S.S.G. § 4A1.3(b) ................................................................................. 14

U.S.S.G. § 5B1.1(a)(w) ............................................................................ 16

**Miscellaneous**

United States Sentencing Commission, *Weighing the Impact of Simple Possession of Marijuana* 16 (Jan. 2023) ................................................. 17

iv

# I. INTRODUCTION

The United States Sentencing Guidelines serve as a helpful benchmark for a person's sentence, but they can't account for everything.  This is especially the case when it comes to Mr. Clemons.  As explained below, the guidelines here fail to account for the fullness of Mr. Clemons's life, the context of his criminal history, and the details of his offense of conviction.  For these reasons, the defense urges the Court to calibrate Mr. Clemons's guidelines correctly and arrive at a sentence that fits both the person and the crime.  In particular, the defense contends that a sentence of 51 months imprisonment is sufficient, but no greater than necessary, to achieve the goals of sentencing.

# II. ARGUMENT

The "overarching" directive of sentencing is that the court shall "impose a sentence sufficient, but not greater than necessary," to comply with the purposes of sentencing.  *Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (citations omitted).  This command reflects the "uniform and constant . . . tradition . . . to consider every convicted person as an individual and every case as a unique study in the human failings that sometimes mitigate, sometimes magnify, the crime and the punishment to ensue."  *Gall v. United States*, 552 U.S. 38, 52 (2007) (citations omitted).  Underlying this notion "is the principle that the punishment should fit the offender and not merely the crime."  *Pepper v. United States*, 562 U.S. 476, 487-88 (2011) (citations omitted).  In short, this Court must try to understand all of the relevant context before imposing a sentence.  *See id*. (explaining that it is "essential . . . to [the] selection of an appropriate sentence" for the court to be "in the possession of the fullest information possible concerning the defendant's life and characteristics").

As such, this memorandum is divided into two parts.  Part A tells Mr. Clemons's story and establishes context for the defense's arguments concerning the guidelines and the 3553(a) factors.  Part B analyzes the application of the guidelines and the 3553(a)

factors to Mr. Clemons's case.  Ultimately, the defense contends that a sentence of **51 months in custody** is sufficient, but no greater than necessary, to achieve the goals of sentencing.

A.   **Mr. Clemons's Story**

1.   **After a Childhood Plagued by Sexual Abuse, Drug Use, Lies, and Instability, Aubrey Nearly Loses Hope**

In many ways, Aubrey's childhood was defined by a tragedy that struck his parents, Vertina Clemons and Dale Waller, before Aubrey was even born.  Shortly before Aubrey's birth, Vertina and Dale lost their oldest son, Kendale, during childbirth.  (Dkt. 27, Rev'd PSR ¶ 85).  Dale responded by drowning his pain in drugs and alcohol, and Vertina responded by kicking Dale out as soon as she became pregnant with Aubrey.  (*Id.* ¶¶ 84-85).

Vertina lied to Dale, telling him that Aubrey was not his biological son, and once Aubrey was born, she continued telling this same lie to Aubrey.  (*Id.*).  Vertina told Aubrey that his father was a man named James, who Vertina dated during Aubrey's childhood.  (*Id.* ¶ 84).  Aubrey believed this until the fourth grade, when Dale stopped by to take Aubrey to a local store, buy him a small Ninja Turtles toy, and tell Aubrey that he was actually Dale's own son.  (*Id.* ¶ 85).  Because of Dale's struggle with crack addition, Aubrey would not see his dad again until Aubrey was around 16 years old, but he always held onto the Ninja Turtles toy as a reminder that his real father was out there somewhere.  (*Id.*).

Because Vertina raised Aubrey and his sister Ashley without consistent support from a partner, she worked long hours at multiple jobs throughout Aubrey's childhood.  (*Id.* ¶ 82).  She moved Aubrey and Ashley around a few times, but they generally stayed in the Louisville projects.  (*Id.*).  Growing up in the projects, Aubrey remembers a childhood permeated with gunshots, teenage drug and alcohol abuse, gang fights, and news of his childhood friends dying in the neighborhood.  (*Id.*).  However, Aubrey also remembers many talks with his mother and the aunts who helped raise him, and these

2

adult role models always encouraged Aubrey to work hard to earn a better life for himself.  (*Id.* ¶¶ 82-83, 86).  Aubrey excelled in school, inheriting a love of reading that has remained with him to this day, and he decided from childhood that he would find a route to success that did not involve joining a gang.  (*Id.* ¶ 86).

Tragically, in addition to growing up in a traumatic environment generally, Aubrey experienced life-altering sexual abuse and bullying while growing up.  (*Id.* ¶¶ 86-89).  Because Aubrey was a gifted and diligent student, other kids at school started bullying him from a young age, and he learned to "dumb himself down" to avoid being targeted.  (*Id.* ¶ 86).  In addition to the typical name-calling and physical intimidation, older kids in elementary school began to abuse Aubrey sexually as early as Kindergarten, forcing him to show them his private parts and touch theirs.  (*Id.* ¶ 87).  The sexual abuse intensified as Aubrey grew older, stalking him outside the home.  In late elementary school, high school kids who frequently babysat Aubrey would touch his private parts and force him to perform oral sex on them while babysitting.  (*Id.* ¶ 88).  The shame that young Aubrey felt from this abuse devastated him, leading him to attempt suicide at the age of 12 by cutting his wrists.  (*Id.* ¶ 107; *See also* Exh. A, University of Louisville Medical Documents, at 1).

Thankfully, Aubrey survived his suicide attempt, but he continued to act out as a way to deal with the trauma he was too young to process.  He spent most of his middle school years with older kids in high school, experimenting with alcohol, drugs, and sex in order to distract himself from his pain.  (Rev'd PSR ¶ 89).  Near the end of high school, he learned that his first son, Aubrey Clemons Junior, was on the way.  (*Id.* ¶ 89).  This news set Aubrey's life on a whole new path.

### 2. Mr. Clemons Regains Hope After Becoming a Father, but his Future Plans are Cut Short by a Five-Year Sentence for Selling Burned DVDs

From the moment he became a father in late high school, Mr. Clemons's whole world changed.  (*Id.*).  Mr. Clemons has written about the day that his son Aubrey was

born: "They carried my boy away and promised 24-hour surveillance for his safety. They placed a band around my wrist. Once all the excitement calmed down I looked to see with (*sic*) the band said. They had identified me as Aubrey Junior's father. I felt complete. I felt I had a purpose. I found my honor." Aubrey Clemons, "First Born," *Clemons' Clever Conception* 28-30, 29 (2017) (*attached as* Exhibit B). Mr. Clemons has also written about the importance of fatherhood to him generally in his poem "The Son of a Sun," in which he aspires to treat his children as the central animating force of his life, just like the sun serves as the central animating force of the universe. Aubrey Clemons, "The Son of a Sun," *Clemons' Clever Conception* 27 (2017) (*attached as* Exhibit C).

Now a father, Mr. Clemons started working hard to get his life in order. Mr. Clemons focused on his studies and graduated high school with his firstborn son in attendance. (Rev'd PSR ¶ 89; *see also* Exh. B at 29-30 (describing Mr. Clemons attending class the day his son was born so that he could set a good example)). At this point, Mr. Clemons's father (Dale Waller) had reconnected with him after overcoming his crack addiction, so Mr. Clemons moved to Atlanta with his father to earn a living for himself and his son. (Rev'd PSR ¶¶ 90-92).

Mr. Clemons appreciated the opportunity to reconnect with his father while working at his drywall business, but given their history, their relationship was also fraught. (*Id.*). Mr. Clemons's father had re-married, and he often prized the children from his recent marriage over his relationship with Mr. Clemons. For example, when Mr. Clemons told one of his father's daughters that she should speak more respectfully to their father, Mr. Clemons's father turned on him for standing up for him and brandished a gun in his face. (*Id.* ¶ 91). As another example, Mr. Clemons's father bought Mr. Clemons a car for his high school graduation, but by the time Mr. Clemons arrived in Atlanta, his father had given that car to one of Mr. Clemons's stepsisters. (*Id.*). While working for his father, Mr. Clemons had his first daughter, Audreyanna,

4

and he decided to start considering other opportunities to make more money in business apart from his father.

In Atlanta, Mr. Clemons met a friend who introduced him to the business of re-selling DVDs and CDs.  (*Id.* ¶ 94).  Mr. Clemons would pick up DVDs and CDs from swap meets vendors in Atlanta and then re-sell those DVDs and CDs at a profit to other buyers.  (*Id.*).  This business was successful, allowing Mr. Clemons to provide for his children and visit them frequently in Tampa and Louisville.  He was admired in Louisville, especially, as an example of someone who ascended from a difficult upbringing to become a respected businessman and father.

However, on September 3, 2004, Mr. Clemons learned that his DVD and CD business was not as legal as he had thought.  (*Id.* ¶ 94).  Mr. Clemons was driving through a rural part of Kentucky on his way to visit his son Aubrey Junior, when officers pulled him over and found approximately $5,375 worth of DVDs in his trunk. (Exh. D - Police Report).  From the start, Mr. Clemons cooperated with the officers, explained that he had not realized selling the DVDs was illegal, and even provided a signed statement the day of his arrest on the nature of his involvement in the DVD re-sale business.  (Exh. E - Statement to Police).  In a sharp twist of fate, however, Mr. Clemons was sentenced to five years imprisonment for selling DVDs, just as his third child, Aubreyion, was about to be born.  (Rev'd PSR ¶¶ 44, 94).

This conviction devastated Mr. Clemons, both because it took him away from his family and because it made him question whether his quest to live a lawful and successful life was doomed to fail from the start.  Already hurt that Mr. Clemons had left his business, his father told him that he was a disappointment and refused to speak to him while he was incarcerated.  With nowhere left to turn, Mr. Clemons decided he had too much to lose to throw his life away.  While in custody, he began writing poems to channel his pain into words he hoped would inspire others.  He wrote the following during this five-year stint in custody: "My pain is concentrated and compressed, an oven/when I'm stressed … My congregation consists of convicts that's far from

5

perfect/Yet God recommend that they get a second chance!/See lord knows we worth it!/Our pain will bring success to the surface, as well as explain the existence and purpose." Aubrey Clemons, "Fuel for the Fight," *The Proverbs & Somber Memories of Aubrey* 46-47 (2012) (*attached as* Exhibit F).

Determined to rebound from his time in custody, Mr. Clemons studied the law governing his case so that he could understand why his DVD and CD re-sale business was illegal. (Rev'd PSR ¶ 95). He learned that if he sold original music directly from artists to consumers, he could run a lawful mixtape business that promoted local musicians. (*Id.*). When Mr. Clemons was released from custody around 2010, he initially did just that: he started a CD and mixtape business that he ensured was run legally. (*Id.*). He also began attending classes at a local community college with the hope of bettering his career, but he ultimately had to end his enrollment so that he could earn enough money for his family. (Exh. G).

Around this same time, Mr. Clemons diligently sought mental health treatment so that he could address the trauma that had caused many of his past mistakes. Multiple counselors and treatment centers turned him away, so he finally checked in at University of Kentucky in Louisville in attempt to get help. (*Id.* ¶ 106; *see also* Exh. A). When he attempted to check in, however, the hospital staff searched him and informed him that they needed to hold him involuntarily. (Exh. A). This scared Mr. Clemons, both because it reminded him of his recent stint in custody and because it would take him away from providing for his children. (*Id.*). Ultimately, Mr. Clemons told the hospital that he did not need treatment so that he'd be free to leave their care. This experience caused Mr. Clemons to be wary of mental health treatment for much of his adult life and has hindered his ability to obtain treatment. (Rev'd PSR ¶ 106). Without the opportunity to fully face his demons, Mr. Clemons's life began to look like it was taking a dark turn again, until he met Ebony O'Rae.

### 3.     Mr. Clemons Experiences a Personal Renaissance and Becomes a Role Model in his Community

Around the end of 2011, Mr. Clemons began attending career development workshops through a Louisville nonprofit called Network Center for Community Change ("NC3"), launching a period of Mr. Clemons's life that he refers to as his "Renaissance." At NC3 events, Mr. Clemons met a community advocate named Ebony O'Rae, who affirmed Mr. Clemons's ability to use his story to inspire others in Louisville. Mr. Clemons took her inspiration and ran with it. Here are some of his most notable accomplishments from his "Renaissance Period" starting around late 2011 and continuing until around 2015[1] (although, as will be noted, he's remained involved in several of these efforts since):

- He started a boxing gym in the Smoketown Neighborhood of Louisville, where Muhammad Ali once trained, to teach children from his neighborhood self-defense and fitness. This gym was profiled in a local Louisville paper in 2012. (Exh. H).

- He began leading trainings and headlining events for NC3. (Exhs. I-J).

- He co-founded a nonprofit called Hope by Hope, which met a range of needs in Louisville, including tutoring children, teaching basic job skills to high schoolers, orchestrating local gang ceasefires, organizing community trash clean-ups, and providing mentorship opportunities for children looking to make a difference. Mr. Clemons served as Vice President of Hope by Hope until around 2017, and he has remained involved as a volunteer and consultant. (Exhs. K-M)

- Around 2015, Mr. Clemons also became involved with Kentuckians for the Commonwealth ("KFTC"), a civic engagement and voter

---

[1] It is also worth noting that during this time period, Mr. Clemons had only minimal contact with law enforcement: a misdemeanor trespassing fine (Rev'd PSR ¶ 50); a term of misdemeanor probation for driving without insurance (*Id.* ¶ 51), and a term of misdemeanor probation for simple possession of marijuana in 2015 (*Id.* ¶ 52).

empowerment nonprofit.  (Exhs. N-O).  Mr. Clemons continued his involvement with KFTC through 2021.

As he sits in his cell now, Mr. Clemons looks back at this period of his life as a reminder that he's capable of being the leader and father that his mother always encouraged him to become.  But this period was far from perfect.

Mr. Clemons experienced a personal tragedy around 2013 that brought his traumatic childhood full-circle and ultimately led to the end of his Renaissance era.  As Mr. Clemons deepened his involvement in Louisville, he began a romantic relationship with Ebony O'Rae and they eventually conceived a child.  (Rev'd PSR ¶ 96).  Leaders in the Louisville community called Aubrey and Ebony a "Power Couple" because of their deep commitment to community service, and they spoke with excitement about the family they were about to start together.  Tragically, however, this pregnancy resulted in a still birth.  (*Id.*).

A tragedy like a still birth could destabilize just about anyone, frankly, but this tragedy possessed a unique sting for Mr. Clemons.  Around the same time that he and Ms. O'Rae's child was still born, Mr. Clemons's father lost his business in Atlanta and relapsed again into crack cocaine addiction, an addiction still wreaking havoc on his life today.  Mr. Clemons knew that a still birth had led his father down a dark path, and seeing his dad relapse just as he himself experienced that same tragedy, Mr. Clemons's hope for a better life began to fade.  Mr. Clemons ended his relationship with Ms. O'Rae because it was too painful, moved back into his old neighborhood, and doubled down on his past pattern of using drugs as a coping mechanism.  (*Id.* ¶¶ 96-97).

### 4.    Mr. Clemons's Substance Abuse and Financial Stability Worsen, Especially During the COVID-19 Pandemic

The next period of Mr. Clemons's life is complicated.  Although he ultimately spiraled downward to the point of committing the instant offense, he also continued to make a difference as a father and community advocate.  Mr. Clemons continued to invest in his children, earning him the respect of his family members, his children, and

8

his close friends.  Many have written moving letters about the ways that Mr. Clemons has inspired them.  (Exhs. P-Z).  Especially inspiring, Mr. Clemons's son, Aubreyion, has written about how his father's influence encouraged him to reject an offer to join a gang.  (Exh. P).  In addition to remaining committed to his family, Mr. Clemons remained committed to his community.  He continued to volunteer with Hope by Hope, the nonprofit he helped start, and he's given KFTC several moving quotes and interviews in recent years on the importance of voting.  (Exhs. AA-DD).



*Mr. Clemons with Aubrey Junior at his middle school graduation (left), his daughter Audrey at her high school graduation (middle), and his son Aubreyion at his high school graduation (right)*

1       During this period, Mr. Clemons also grew his family and remained invested in

2   the lives of his young children.  Kids are naturally drawn to Mr. Clemons's mixture of

3   physical stature and approachable charisma, and he is a beloved father and uncle.



*Mr. Clemons celebrating his daughter Harlee's birthday (left); Mr. Clemons*
*celebrating Halloween with his adopted sons Damauri and Daryl, and a child from his*
*sister Ashley's neighborhood (middle); Mr. Clemons visiting his daughter Audrey and*
*her boyfriend with his young daughter Akhaliona (right).*

        Unfortunately, just as Mr. Clemons deepened his ties to his family and his

community, his internal struggles became increasingly bleak.  Mr. Clemons began

using marijuana daily and abusing cocaine regularly.  (Rev'd PSR ¶¶ 96, 109, 110).  He

also had been abusing painkillers periodically ever since being prescribed Vicodin for a

dental procedure, and during this period, he began abusing painkillers more routinely.

(*Id.* ¶ 111).

Mr. Clemons began a romantic relationship with Cierra Hunt during this time, which both enriched and complicated his life.  (*Id.* ¶ 99).  Ms. Hunt motivated Mr. Clemons to continue to look for stable employment during this difficult time, and she also encouraged his periods of sobriety, especially from cocaine and painkillers. Enthusiastically, Mr. Clemons essentially adopted Ms. Hunt's two sons from a previous relationship, Daryl and Demauri, but this decision also increased the pressure he felt to earn enough money to provide for his children.  (*Id.* ¶ 99).  When the COVID-19 pandemic caused nationwide shutdowns, Mr. Clemons's struggle to find enough work to provide for his family became even more dire.  (*Id.* ¶¶ 118-121).  This pressure increased at the same time that his joy increased with the birth of his and Ms. Hunt's first biological child, August Clemons, born in June of 2023.  (*Id.* ¶ 100).



*Mr. Clemons feeding his infant child, August Clemons.*

As Mr. Clemons struggled with his internal demons of substance abuse and past trauma, his external struggle with poverty worsened.  He grew tired of relying on the generosity of family to feed and clothe his children.  He also worried that he was failing Cierra as a partner.  He celebrated his anniversary with Cierra on September 15, 2023, the day before he became involved in the instant offense.  He bought her the only present he could afford at the time: a roll of toilet paper from Amazon with her initials printed on it.  As she opened his gift, he wished desperately that he could have bought her a necklace, a fancy date night, or really anything else.  The night became even

11

worse when it became clear that August was suffering some sort of infection, and Mr. Clemons worried about whether he could afford his son's medication.

The next day, while at a restaurant for his cousin's birthday party, Mr. Clemons met a man (Co-conspirator 1) who offered to involve Mr. Clemons in his operation selling marijuana edibles. (Rev'd PSR ¶ 8). Co-conspirator 1 offered Mr. Clemons a flip-phone and encouraged Mr. Clemons to call him if he was ever interested in flying to Los Angeles to bring edibles back to Louisville. (*Id.* ¶ 8). Mr. Clemons then made one of his most regrettable mistakes: he said yes. Given that Kentucky had recently voted to legalize marijuana for medical purposes, Mr. Clemons justified his decision to himself, convincing himself that transporting marijuana was at least different than transporting hard drugs. He borrowed money from a friend to fly to Los Angeles and rent a hotel room. When he called the number on his flip phone to pick up a package of edibles, a stranger showed up at his door, and handed him a plastic bag full of fentanyl pills. (*Id.* ¶ 10-11). Mr. Clemons called back the number on his flip phone, and Co-conspirator 1 made clear that he needed to destroy the phone and carry the package through airport security. (*Id.* ¶ 11).

Mr. Clemons felt scared out of his mind and leagues out of his depth. Although he had grown up around drug dealers, he had made a point to keep himself away from the gangs that moved drugs in Louisville. He could see no way out of the situation for himself, and he had a panic attack as he worried that Co-conspirator 1 and his associates may have sensitive information about how to hurt him and his family. After a night of essentially no sleep, Mr. Clemons decided to destroy the flip phone, hide the pills in his neck pillow, and attempt to get through airport security rather than risk his family's safety by angering a fentanyl ring. (*Id.* ¶¶ 12-15). As Mr. Clemons writes in his letter, he has regretted this decision ever since: "I was weak for letting fear take me from my family. I should've been brave enough to face whatever could've happened to me if I didn't go to that Airport. Cause fear caused me to throw my life away, I made things worse!" (Exh. EE).

12

Since his arrest in September, Mr. Clemons has continued to grapple with the impact of this mistake on himself and his family. Ms. Hunt has experienced periods of homelessness in the last few months. (Rev'd PSR ¶ 101). And although she has now found a one-bedroom apartment, the apartment is too small for her and her three children, and she is forced to rely on donations, government assistance, and selling plasma to make ends meet. (*Id.*).

Mr. Clemons has reflected extensively on the steps that have led him here. He feels like he was lucky enough to experience the rebirth of a phoenix after his five-year sentence for selling burned DVDs in Kentucky, and he's disappointed in himself for essentially returning back to his ashes. Still, Mr. Clemons calls his family every day, reads voraciously, and researches custodial treatment programs he can participate in once he's sentenced and designated a facility. He hopes to continue drug and mental health treatment after leaving custody, (*Id.* ¶¶ 106, 114), leave substance abuse behind completely, and draw on his entrepreneurial spirit and strong work ethic to find a trade where he can be successful again. More than anything, he wants to experience as much of his son August's life as possible, celebrate all his children as they advance through life's milestones, and re-earn his position as a model citizen in Louisville. Mr. Clemons recognizes that he's in the ashes again, but he remains determined to keep his fire alive, living hope by hope that he too can be reborn again.

## B.   Mr. Clemons's Sentence

Turning from Mr. Clemons's life to Mr. Clemons's recommended sentence, the guideline range in this case fails to account for essential details regarding Mr. Clemons's criminal history, the instant offense, and Mr. Clemons's story. After calibrating the guideline range to account for these essential details, the defense contends that a sentence of 51 months is sufficient, but no greater than necessary, to achieve the goals of sentencing.

1.      **Procedural History**

On December 19, 2023, Mr. Clemons pleaded guilty pursuant a plea agreement to the sole count in the instant indictment, which charged him with possession of fentanyl with intent to distribute.  (Dkt. 10, Indictment; Dkt. 21, Plea Agreement).  In the plea agreement, the government and defense agreed that Mr. Clemons is entitled to a two-level reduction for minor role and is eligible for safety valve.  (Plea Agreement ¶¶ 14, 17.)  The government further agreed to recommend a three-level reduction for acceptance of responsibility due to Mr. Clemons's decision to plead guilty early and save the government the resources that would have been required to litigate his case to verdict.  (*Id.* ¶ 3(c)).

2.      **The Advisory Guidelines**

a.      **The USPO has Calculated Mr. Clemons's Offense Level Correctly**

In the Revised PSR, USPO has correctly calculated the offense level for the instant offense.  The Revised PSR calculates a **Base Offense Level of 30**, based on the fentanyl quantity's placement on the Drug Quantity Table ("DQT").  (Rev'd PSR ¶ 22); U.S.S.G. § 2D1.1(a)(5), (c)(5).  It **deducts two levels** because Mr. Clemons is eligible for safety valve, (Rev'd PSR ¶ 23); U.S.S.G. § 2D1.1(b)(18),  as well as **deducting two additional levels** for Mr. Clemons's minor role in the offense, (Rev'd PSR ¶ 30); U.S.S.G. § 3B1.2(b).  Finally, the Revised PSR applies a **three-level reduction** for Mr. Clemons's acceptance of responsibility, leading to a **Total Offense Level of 23**. (Rev'd PSR ¶¶ 34-35, 37) U.S.S.G. § 3E1.1(a)-(b).  Both the government and the defense agree with USPO's calculation of the offense level in this case.  (Dkt. 29, Gov't SPP at 3).

b.      **Mr. Clemons's Criminal History Category is Overstated**

Under USSG 4A1.3(b), "[i]f reliable information indicates that the defendant's criminal history category substantially over-represents the seriousness of the defendant's criminal history or the likelihood that the defendant will commit other

14

crimes, a downward departure may be warranted."  According to the PSR, Mr.

Clemons's criminal history score is 13, just enough to place him in Criminal History

Category ("CHC") VI.  However, this criminal history category overstates the

seriousness of Mr. Clemons's criminal history in two ways: first, because of guidelines

technicalities, Mr. Clemons receives three points for an unduly harsh five-year sentence

from Kentucky for selling burned DVDs in 2004;[2] and second, Mr. Clemons receives

three of his points from misdemeanor convictions for simple possession of marijuana.

Given both these overstatements, the Court should depart downward regarding criminal

history to CHC V.

### (1)    Five-Year Sentence for Selling Burned DVDs

There are two main reasons to depart downward to CHC V in order to mitigate

the outsized impact that Mr. Clemons's DVD bootlegging conviction exerts on his

criminal history.  (*See generally* Rev'd PSR ¶ 44). **First, five years imprisonment is

too punitive a sentence for selling burned DVDs**.  To benchmark this, the Court

should consider what Mr. Clemons's guideline range would have been under the United

States Sentencing Guidelines for an analogous federal charge.  Copyright infringement

is criminalized in 18 U.S.C. §§ 2319-2320, which means that U.S.S.G. § 2B5.3 applies.

Under Section 2B5.3(a), Mr. Clemons would receive a **Base Offense Level of 8** for

selling burned DVDs and CDs.  Mr. Clemons would receive an additional level under

Section 2B5.3(b)(1), a specific offense characteristic premised on the commercial value

of the infringed product.  The value of the contraband DVDs was $5,375 according to

the police report.  (Exh. D, Police Report). Now at **offense level 9**, Mr. Clemons would

receive a two-level reduction for accepting responsibility by pleading guilty, bringing

Mr. Clemons to a **Total Offense Level of 7.** *See* U.S.S.G. § 3E1.1(a).  At the time that

Mr. Clemons committed the bootlegging offense (9/2/04), he had committed two

---

[2] The government agrees that the Court should depart downward to CHC V to
account for the outsized impact of this conviction.  (*See* Dkt. 29, Gov't SPP at 3-4; *but
see* Dkt. 30, Second Addendum to PSR (USPO maintaining its position that CHC VI is
appropriate).

misdemeanors as an adult, each of which would carry one criminal history point.  (See PSR ¶¶ 42, 43).  With both these points, he would have been at **CHC II**.

**At Total Offense Level 7 and CHC II, Mr. Clemons would have received a guideline range of 2-8 months for selling burned DVDs.**  This means Mr. Clemons received a sentence from Kentucky that is 7.5 times higher than the high-end of his analogous federal guideline range, and 30 times higher than the low-end.  His DVD bootlegging conviction would have fallen in Zone B on the sentencing table, meaning he would have been eligible for probation with a term of home detention.  *See* U.S.S.G. § 5B1.1(a)(w).

And of course, if Mr. Clemons had received a sentence even close to his guideline range for selling burned DVDs, he would not receive *any* criminal history points for this prior.  On the assumption that three-point offenses tend to be more serious than two-point and one-point offenses, the guidelines' counting rules sweep more broadly with three-point offenses to ensure they impact a defendant's CHC.  For two-point and one-point offenses, a sentence counts for points if it was imposed within 10 years of the instant offense.  U.S.S.G. § 4A1.2(e)(2).  But for three-point offenses, a sentence counts if it was imposed within 15 years of the instant offense *or if the offense resulted in the defendant being incarcerated during that 15-year period*.  U.S.S.G. § 4A1.2(e)(1).  This conviction was imposed just over 17 years before the instant offense, so it is only counted because Mr. Clemons was incarcerated during the 15-year period leading up to this offense.  These sweeping CHC counting rules trade on the assumption that three-point offenses carry more gravity than two-point and one-point offenses, but simply put, selling burned DVDs is just not that serious of conduct.  The Court should right this error by departing to CHC V.

Second, the context surrounding Mr. Clemons's conviction for selling burned DVDs further supports departing downward to CHC V.  **To start, Mr. Clemons played a minor role in the DVD bootlegging business**.  According to the PSR and to a statement Mr. Clemons signed the day of his arrest in 2004, Mr. Clemons had no part

16

whatsoever in the actual burning of the DVDs that he sold, explaining why he failed to appreciate that his conduct was illegal.  (Rev'd PSR ¶ 94; Exh. E).  **Furthermore, Mr. Clemons sold DVDs and CDs because he thought it was a lawful alternative to a career in a gang**.  Of course, ideally Mr. Clemons would have engaged in a business that was completely above-board, but given that he grew up surrounded by the sounds of gunshots and drug sales, he chose a relatively harmless means of providing for his family.  (*See* Rev'd PSR ¶ 82).  **And finally, when Mr. Clemons emerged from his five-year sentence around 2010, he made a point to start a mixtape business in full compliance with the law**.  (Rev'd PSR ¶ 95).  He learned from this offense and took proactive measures not to break this law again, so it is difficult to comprehend why he should still be paying for this 17-year-old offense today.

### (2)   Simple Possession of Marijuana Misdemeanors

The Court should also depart downward to account for the outsized impact of Mr. Clemons's three prior misdemeanor convictions for simple possession of marijuana, which account for three of Mr. Clemons's criminal history points cumulatively.  (Rev'd PSR ¶¶ 52, 54, 55).  Guidelines commentary encourages courts to consider departing downward regarding criminal history when someone "received criminal history points from a sentence for possession of marihuana for personal use, without an intent to sell or distribute to another person."  U.S.S.G. § 4A1.3, cmt. n.3(A)(ii).  Justifying this, a recent USSC study analyzed the outsized impact that cannabis-related misdemeanors priors have exerted on federal defendants, especially Black federal defendants, who account for 47 percent of the federal defendants with marijuana priors.[3]  If even one of these three convictions did not count toward Mr. Clemons's criminal history, he would be in CHC V, further supporting a downward departure.

---

[3] United States Sentencing Commission, *Weighing the Impact of Simple Possession of Marijuana* 16 (Jan. 2023), attached as Exhibit FF.

1    **3.    18 U.S.C. § 3553(a) Factors**

2        **a.    The Nature and Circumstances of Mr. Clemons's Offense**

3            **Support a Lenient Sentence**

4        To be clear, fentanyl is a gravely serious drug—on that, Mr. Clemons, the

5    government, and the Court can all agree.  But a crucial fact in Mr. Clemons's case is

6    that he did not intend to traffic in fentanyl.  Mr. Clemons came to Los Angeles

7    believing that he would receive marijuana edibles to bring back to Co-conspirator 1 in

8    Louisville.  (Rev'd PSR ¶¶ 8-9).  He only learned that Co-conspirator 1 had lied to him

9    when a stranger showed up at his hotel room, handed him a bag of fentanyl pills, and

10   left.  (Rev'd PSR ¶¶ 10-11).  At that point, rather than risk death at the hand of a

11   criminal fentanyl operation, Mr. Clemons made the mistake of attempting to pass the

12   pills through TSA.

13       Because Mr. Clemons was caught with 1,099 grams of fentanyl, the U.S.S.G.

14   Drug Quantity Table ("DQT") calculates a Base Offense Level of 30.  U.S.S.G. §

15   2D1.1(c)(5).  However, given the circumstances of Mr. Clemons's offense, it's worth

16   calculating what his guidelines would have been if he had committed the crime he flew

17   to Los Angeles intending to commit—not to suggest that the Court should sentence Mr.

18   Clemons according to the marijuana guidelines, but as a baseline for determining a

19   reasonable sentence in light of the "nature and circumstances of the offense."  18

20   U.S.C. § 3553(a)(1).

21       To account for the seriousness of Mr. Clemons's conduct, the defense will use

22   for this hypothetical the cannabinoid product that the DQT punishes most severely:

23   hashish oil.  If Mr. Clemons was caught with 1,099 of hashish oil, the DQT would

24   produce a **Base Offense Level of 18**.  U.S.S.G. § 2D1.1(c)(11) (assessing Base Offense

25   Level 18 for "[a]t least 800 G but less than 1.2 KG of Hashish Oil").  Starting at Base

26   Offense Level 18, Mr. Clemons would receive a **two-level reduction** for being safety

27   valve eligible under U.S.S.G. § 2D1.1(b)(18), a **two-level reduction** for minor role

28   under U.S.S.G. § 3B1.2(b), and **a two-level reduction** for Acceptance of

Responsibility under U.S.S.G. § 3E1.1(a).[4]  Thus, if Mr. Clemons had actually possessed 1,099 grams of hashish oil rather than 1,099 grams of fentanyl, Mr. Clemons's crime would receive a **Total Offense Level of 12**.  At CHC V and Total Offense Level 12, Mr. Clemons would receive a guideline range of 27-33 months.

However, Mr. Clemons acknowledges that this guideline range is too low to account for the gravity of his conduct.  At the end of the day, Mr. Clemons attempted to carry over a kilogram of a fatal drug through a major United States airport.  And although Mr. Clemons discovered that he was transporting fentanyl too late in the game to safely withdraw from the drug trafficking operation, he discovered the fentanyl early enough that his eyes were wide open to the seriousness of the drug by the time he walked through LAX in September.

Because the government's range of 84-105 months is too high to account for the mitigating context of this offense, and because the hypothetical hashish oil range of 27-33 months is too low to account for its seriousness, Mr. Clemons respectfully suggests choosing a range in the middle.  The government lands at TOL 23 for Mr. Clemons, and the hypothetical hashish oil calculation lands at TOL 12.  Mr. Clemons recommends using a TOL between both these figures: TOL 18.  At TOL 18 and CHC V, Mr. Clemons's calibrated guideline range would be 51-63 months.

### b.    When Imposing Sentence, the Court Should Account for Mr. Clemons's Personal History and Characteristics

Mr. Clemons is the first to admit that he's made many serious mistakes in the course of his 42 years.  (Exh. DD).  But the defense would encourage the Court to acknowledge that these mistakes are not the full story when it comes to Mr. Clemons. As stated above, Mr. Clemons was horrifically abused as a child, grew up without a father, and spent most his childhood in a low-income neighborhood replete with drug

---

[4] Mr. Clemons would not receive the third level for Acceptance of Responsibility in this hypothetical, because his Offense Level pre-Acceptance would be less than 16 levels.  *See* U.S.S.G. § 3E1.1(b).

19

abuse and lacking in supervision. (Rev'd PSR ¶¶ 82, 84-88). Mr. Clemons was introduced to drugs at a young age, and the siren call of drugs as an easy relief from pain has led him down several wrong paths. (*Id.* ¶ 88). Mr. Clemons's struggles with addiction and financial desperation ultimately led him to commit this crime.

Mr. Clemons's story is already detailed above, so the defense would here highlight one unique and compelling attribute of Mr. Clemons in particular: although he's been in a dark place for the last few years, Mr. Clemons clearly has what it takes within him to live a better life. This is clear from his early decision to reject gang life in favor of earning a living through hard work and innovation, his reflectiveness on his past through his writing and poetry, his admirable and storied commitment to bettering the Louisville community, and perhaps most of all, his genuine love for each of his children. Mr. Clemons has enjoyed periods of life when he simply made an honest living, looked after his family, and dedicated his surplus time to building his community. It's a cliché to call an encounter with federal law enforcement a wake-up call, but at least when it comes to Mr. Clemons, this cliché does not suggest that this case is waking him up from a lifetime of sleep. Instead, he's waking up to a version of himself that was alive and well in recent years. Once Mr. Clemons receives the mental health and drug treatment he needs and desires, there is evidence-backed hope that Mr. Clemons will find a way to live sober and fully present to the needs of his family, his community, and his self.

Weighing Mr. Clemons's past mistakes as well his past triumphs, the Defense contends that a sentence at the low-end of Mr. Clemons's calibrated guideline range is appropriate: 51 months.

## C.    Conclusion

Mr. Clemons respectfully requests the Court sentence him to 51 months in custody. As both the defense and government agree, the Court should department downward to CHC V to account for Mr. Clemons's overstated criminal history. Furthermore, the Court should vary downward to account for the mitigating

circumstances of Mr. Clemons's offense.  For these reasons, and those stated above, the defense contends that a sentence of 51 months is sufficient, but not greater than necessary, to achieve the goals of sentencing.

Respectfully submitted,

CUAUHTEMOC ORTEGA
Federal Public Defender

DATED:  February 6, 2024              By   /s/ Jake Crammer

JAKE CRAMMER
Deputy Federal Public Defender
Attorney for AUBREY CLEMONS

21

## **PROOF OF SERVICE**

I, **Amadeus Duran**, declare that I am a resident or employed in Los Angeles County, California; that my business address is the Office of the Federal Public Defender, 321 East 2nd Street, Los Angeles, California 90012-4202, Telephone No. (213) 894-2854; that I am over the age of eighteen years; that I am not a party to the action entitled above; that I am employed by the Federal Public Defender for the Central District of California, who is a member of the Bar of the State of California, and at whose direction I served a copy of the attached **DEFENDANT'S SENTENCING POSITION; DECL OF COUNSEL; EXHIBITS** on the following individual(s) by:

| [ ] Placing same in a sealed envelope for collection and interoffice delivery addressed as follows: | [ ] Placing same in an envelope for hand delivery addressed as follows: | [ ] Placing same in a sealed envelope for collection and mailing via the United States Post Office addressed as follows: | [ ] Faxing same via facsimile machine addressed as follows: |

[X] Sent via email to the address as follows:

**Christopher Anderson**
**USPPSO**
**Christopher_Anderson@cacp.uscourts.gov**

This proof of service is executed at Los Angeles, California, on **February 6, 2024**.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge.

*/s/ Amadeus Duran*                    .
**AMADEUS DURAN**

22